# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs November 24, 2009

## STATE OF TENNESSEE v. JOE MAINE

**Appeal from the Circuit Court for Cocke County**
**No. 7233    Rex Henry Ogle, Judge**

---

**No. E2008-02132-CCA-R3-CD - Filed June 3, 2010**

---

Following a jury trial, the Defendant, Joe Maine,[1] was convicted of the 1997 first degree murder of Amy Lynn King and conspiracy to commit first degree murder.  The Defendant waived a jury determination of his sentence, and the trial court sentenced the Defendant to life imprisonment without the possibility of parole for the first degree murder conviction and a concurrent twenty-five year sentence for the conspiracy conviction.  In this appeal as of right, the Defendant contends, relative to his first degree murder conviction, that (1) the trial court erred in denying the Defendant's motion to suppress his statement; (2) the trial court erred in declining to declare a mistrial when inadmissible photographs were published to the jury; (3) the trial court erred in allowing the State to use the actual skull of the victim as an exhibit for demonstrative purposes; (4) the evidence was insufficient to support the jury's verdicts; (5) the trial court erred in sentencing the Defendant; and (6) the trial court erred in not granting a new trial.  Following our review, we affirm the judgments of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and D. MICHAEL SWINEY, Special Judge of the Court of Appeals sitting by designation, joined.

S. Joanne Sheldon, Newport, Tennessee, attorney for appellant, Joe Maine.

---

[1]The Defendant is referred to as Joe Maine, Joseph Maine, Joseph A. Maine, and Joseph E. Maine in the record.  This court will refer to the Defendant by the name contained in the indictment.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; James B. Dunn, District Attorney General; Joe C. Crumley, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

## OPINION

In August 1997, William Joseph Kessler (B.J. Kessler) lived in a small two bedroom home in Cocke County with Shelly Breeden, George Pate, and the victim. Mr. Kessler was renting the property, which contained the small house, several outbuildings, a few storage buildings, two barns, a hen coop, and a cistern used for sewage purposes. Mr. Kessler and Ms. Breeden were engaged to be married, and Ms. Breeden had two children and was six or seven months pregnant with Mr. Kessler's child. Mr. Pate and the victim were dating each other. The Defendant and his girlfriend, Becky Peters, who was seven and a half months pregnant, were acquainted with the group. On occasion, Ms. Peters babysat for Ms. Breeden's two children at the home in Cocke County.

Mr. Kessler worked on the weekends at a restaurant in Gatlinburg and left his car with the group for the weekend; therefore, someone from the group would take him to work on Friday morning and drive the car back to the house. Mr. Kessler would then stay in Gatlinburg for the weekend and return home the following Monday. While Mr. Kessler worked in Gatlinburg on the weekends, Mr. Pate, Ms. Breeden, and the victim routinely engaged in sexual relations. Mr. Kessler was unaware of their activities.

In the summer of 1997, Ms. Breeden and Mr. Pate decided that they wanted to enter into a mutually exclusive relationship and that they wanted to end the relationships with their respective partners and their secret relationship with the victim. However, each of them believed that this could only be accomplished by killing Mr. Kessler and the victim. In order to accomplish this goal, Mr. Pate and Ms. Breeden repeatedly asked the Defendant if he would help them kill Mr. Kessler and the victim. They offered the Defendant a "motorcycle, a car, [and] a [h]ouse trailer"[2] for his involvement. The Defendant refused to participate. When Mr. Pate asked the Defendant if the Defendant could obtain a gun to kill the victim, the Defendant complied and asked a man named "Johnny Sprouse" for a gun. However, Mr. Sprouse did not have a gun.

One weekend while Mr. Kessler was working in Gatlinburg, Mr. Pate and Ms. Breeden went to the Defendant's house and brought the Defendant and Ms. Peters back to

---

[2]A motorcycle owned by Mr. Kessler was located on the property. The trailer is located in Sevierville. The title to the trailer was purchased by Mr. Pate and Ms. Heather Leeper, Mr. Pate's ex-wife, from Hollis Powell for $5,000.

Cocke County. At approximately 10:00 p.m., Mr. Pate told the Defendant that "he was going to kill [the victim]." Mr. Pate asked the Defendant if the Defendant would help him kill the victim. After the Defendant stated that he did not want to be involved, Mr. Pate offered the Defendant the house trailer again for his help in killing the victim. This time, the Defendant said that he would help. Before the Defendant went outside to help kill the victim, Ms. Breeden handed Ms. Peters the title to the house trailer and instructed Ms. Peters to sign the back of the title.

Mr. Pate then told the victim that "he wanted to show her something at the chicken house." Mr. Pate and the victim walked outside to the chicken house, and the Defendant followed shortly thereafter. After visiting the chicken house, Mr. Pate "came around in front of [the victim] with a big knife and cut her throat." The victim fell to the ground and started to scream. Mr. Pate then repeatedly stabbed the victim in the back while the victim "begg[ed] for her life." While she was being stabbed by Mr. Pate, the victim said, "[W]hy are you doing this?" Mr. Pate told the Defendant to "run and get the [hatchet][3] that was leaning against the building that looked like a garage." The Defendant found the hatchet and brought it back to Mr. Pate. Mr. Pate hit the victim in the head with the back of the hatchet and then handed the hatchet to the Defendant. The Defendant hit the victim in the head with the hatchet. When the victim was dead or otherwise unable to run away, Mr. Pate and the Defendant went inside "to decide what to do with the body." While inside, they drank "some vodka to settle [their] nerves."

After some discussion, Mr. Pate told the Defendant that they could put the body in the cistern on the property. The two went outside and tried to put the victim on a tarp that the Defendant had retrieved from the barn. The victim's body rolled off the tarp and onto the Defendant. After they placed the victim's body back onto the tarp, the two carried the victim to the cistern, where they dropped her down the cistern, head first.

When they went back inside, the Defendant had blood on his pants, and Ms. Peters asked the Defendant if he wanted her to wash his pants. The Defendant declined and either said that the victim put up more of a fight than he thought she would or said that he thought there would be more blood. At some point in the conversation, Mr. Pate said, "[W]e took care of [the victim] now we need to find a way to get rid of [Mr. Kessler]." In response, Ms. Breeden showed them "a small bottle" and said, "I have something to help get rid of him."[4]

---

[3]The Defendant refers to the hatchet as an ax throughout his statement.

[4]Mr. Kessler testified that he was sick for several days that summer. It is unclear whether his sickness was the result of an attempt by Ms. Breeden to kill Mr. Kessler.

A few days later, when the victim's body started to smell, Mr. Pate and Ms. Breeden noticed the smell and went to the store to buy carpet freshener and baking soda. Mr. Pate and the Defendant put the carpet freshener and baking soda on the victim's body. The Defendant used a hand sickle to cut open the victim's body to "let the air out." They also placed cinder blocks on the victim's body, presumably to weigh the body down.

The following Monday,[5] Mr. Kessler was concerned because Mr. Pate did not pick him up from Gatlinburg that morning as planned. Mr. Kessler called his mother, who picked him up from Gatlinburg and drove him home. When Mr. Kessler arrived home, Ms. Breeden, Mr. Pate, and the victim were not at the house; however, the house was "ransacked," and the Defendant and Ms. Peters were on the property. The Defendant told Mr. Kessler that Ms. Breeden left Mr. Kessler for Mr. Pate and that Ms. Breeden and Mr. Pate were leaving the state together. Mr. Kessler was angry and told the Defendant to leave. Mr. Kessler called the police to report the destruction and Ms. Breeden's disappearance. He was unable to fill out a missing person's report regarding Ms. Breeden because twenty-four hours had not passed.

Mr. Kessler also called Mr. Pate's mother to tell her to inform Ms. Heather Leeper, Mr. Pate's ex-wife, that Ms. Leeper could come to the property and retrieve some of her and her child's belongings. Ms. Leeper arrived[6] and spoke with Mr. Kessler, the Defendant, and Ms. Peters. Ms. Leeper asked the Defendant for the title to the trailer located in Sevierville. The Defendant told her that he did not know where the title was located. After everyone left, Mr. Kessler gathered clothes, left food for the animals, and left to stay with his mother.

Mr. Kessler returned to the house on several occasions to check on the animals. On August 18, 1997, he was on the property with his brother when he noticed a "strong odor" outside in the backyard. While searching for the source of the smell, Mr. Kessler noticed a knife on the ground and a hatchet leaning against one of the storage buildings. Eventually, he tracked the smell to the cistern on the property. He noticed residue around the top of the cistern and on the ground.[7] He looked in the cistern and saw what he thought was a sheet thrown on top of the water. Upon further investigation, he realized that a body was in the

---

[5]We presume that the day was Monday because Mr. Kessler testified that he was always picked up the Monday morning following the weekends that he worked.

[6]Ms. Leeper testified that she noticed a really bad smell on the property but that she thought it was all of the animals and the dirty house.

[7]Mr. Kessler also found several boxes of used and unused baking soda and carpet freshener located in the pump house on the property. These boxes were introduced into evidence.

cistern. He told his brother that he had found a body, and he and his brother drove to the store so that they could call the police.

When the police arrived at the store, the police followed Mr. Kessler and his brother to the property. Detective Robert Caldwell of the Cocke County Sheriff's Department and Special Agent Barry Brakebill of the Tennessee Bureau of Investigation assisted in the investigation. Mr. Kessler showed Detective Caldwell where the body was located, and Detective Caldwell called the Newport Rescue Squad to remove the body because the officers were unable to remove it themselves. Mr. Kessler stayed as the body was removed from the cistern.

When the body was removed, they saw that the victim's hands were bound to her stomach with a rope and that her body was weighted down with cinder blocks, which were "tied around the body and [then] placed on the body." The victim's head was crushed and destroyed almost to the point of decapitation; therefore, there was no way to physically identify her by her facial features. The victim was wearing a t-shirt, khaki style jeans, and hiking boots. Mr. Kessler was able to identify the body as that of the victim when he saw the shoelaces on the victim's boots. According to Mr. Kessler, the victim always wore one green shoelace and one red shoelace. A full pack of Camel Wide cigarettes, which the victim regularly smoked, was also floating next to the body. Because most of the victim's skull was missing from the body, Dr. Murray Marks, associate professor of anthropology at the University of Tennessee Knoxville, was contacted and asked to drain the cistern and look for the pieces of the skull in the cistern.

Dr. Marks arrived with two of his graduate students and bucketed out the remaining sewage from the 10-foot deep cistern. Dr. Marks took the window screens off the house and used a shifting method to spray the sewage through the screens with a hose to find the pieces of the skull. Through this five to six hour process, Dr. Marks found most of the skull and the victim's jaw bone, which was taken to the university for cleaning and further analysis. The base of the victim's skull was recovered by a forensic pathologist who was performing the autopsy on the victim.

At some point, the Defendant was implicated in the victim's murder. Detective Caldwell and Special Agent Brakebill interviewed the Defendant, who confessed to his involvement in the murder of the victim. The Defendant's statement was introduced into evidence at trial. Based upon the above evidence, the Defendant was convicted of first degree murder.

## ANALYSIS

### I. Motion to Suppress

The Defendant contends that his statement should have been suppressed because he was unable to voluntarily, knowingly, and intelligently waive his Miranda rights. The Defendant contends that he was operating under a limited intellectual ability and was under the influence of intoxicants at the time of the interrogation. The State responds that the Defendant executed a proper waiver of his Miranda rights.

The proof at the suppression hearing on September 17, 2007, consisted solely of the testimony of Detective Caldwell and Jennifer Shelton. Detective Caldwell testified that he was the only detective the Cocke County Sheriff's Department employed at the time of the victim's murder. He stated that on August 18, 1997, the victim's body was discovered in a cistern on Mr. Kessler's property. After interviewing two suspects and "several people who had knowledge about the homicide," Detective Caldwell began looking for the Defendant because he believed that the Defendant "was involved in [the victim's] homicide and had knowledge of [the] homicide." However, he had trouble locating the Defendant because the Defendant "was an escapee from a juvenile facility in Greene County at the time [the victim's] homicide was committed and at the time this investigation was going on." On September 10, 1997, Detective Caldwell finally found the Defendant, who was "in custody because of the escapee charges."

Detective Caldwell testified that Pat Taylor of the sheriff's department, Ms. Shelton, and Agent Brakebill were present for the Defendant's interrogation, which took place in a room in the courthouse. Detective Caldwell informed the Defendant of his Miranda rights when they went into the room. The Defendant waived his Miranda rights, and as soon as Detective Caldwell informed the Defendant that they thought the Defendant was involved in the victim's murder, the Defendant confessed.

The Defendant was seventeen when he was interrogated; however, the Defendant never asked for his mother, an attorney, any medications, or for a break during the interrogation. The interrogation lasted less than three hours. According to Detective Caldwell, the Defendant appeared alert and did not appear to be under the influence of anything. The Defendant told Detective Caldwell that he could read "some" and that he had only completed the eighth grade; therefore, Detective Caldwell transcribed the Defendant's statement and read the statement aloud to the Defendant. Throughout the interview, the Defendant made several corrections to his statement and signed his name next to the corrections, and at the conclusion of the interrogation, the Defendant signed the statement.

-6-

Ms. Shelton, the lead youth services officer of the Cocke County Juvenile Court, was present for the interrogation and acted as an advisor or advocate for the Defendant. She said that she does not ask questions during interrogations and that she normally just "sit[s] there" after telling the juvenile about the process of the interrogation. She stated that the Defendant did not ask for his mother or for his attorney and that the Defendant appeared alert and did not appear to be upset. She admitted that she left the room for a few minutes; however, she stated that she could not remember whether she asked Detective Caldwell to stop the interrogation but that it was common practice for the interview to stop if she left the room. She said that the Defendant did not appear to be under the influence of anything when he was interrogated. She also stated that she had seen the Defendant under the influence on another occasion and that on that occasion, the Defendant was aggressive and violent.

She said that reading the statement to the Defendant was a common practice; that she did not know if the Defendant was able to read or write; and that she believed that the Defendant should have been able to read and write because he was in the ninth grade. Ms. Shelton conceded that she knew that the Defendant was classified as a special education student and that she first came into contact with the Defendant when he was thirteen or fourteen. She stated that she assumed the Defendant knew who she was from their prior interactions. Ms. Shelton remembered going over the location of the events at the house with the Defendant; however, she was unable to identify the diagram that was signed by the Defendant. Ms. Shelton stated that Detective Caldwell did not overreach or coerce the statement out of the Defendant. She believed that the statement was given freely and voluntarily and that she would have stopped the interrogation if she believed otherwise.

In a subsequent hearing, held on November 27, 2007, the Defendant testified regarding the interrogation in 1997. The Defendant stated that he has been in custody for more than 10 years. At the time of his arrest, he was at his mother's house after escaping from a treatment program for his substance abuse problems. The Defendant stated that while he was hiding from the Department of Childrens' Services, he was drinking alcohol and taking cocaine and Valium on a regular basis. The Defendant stated that he was "shooting powder, cocaine" and drinking prior to the interrogation. He said that he was still under the influence of drugs and alcohol when he was arrested; however, he was never given a drug test. The Defendant remembered being arrested by Mr. Taylor, but the only person he "really remembered" being present at the interrogation was Mr. Taylor. He stated that he was asked "questions over and over again" in the interrogation and that those present were "more interested in giving me answers than [they were interested in] me answering the questions." He said that he finally just went "along with them and agree[d] with them and what they said."

The Defendant stated that he was taking "standard" classes and special education classes when he was in school; however, he received failing grades in all of his classes and was sent to alternative learning schools. The Defendant repeated first grade, and "[t]he rest of the time [school officials] just throwed [sic] [him] forward." The Defendant was able to read at the time of the interrogation, "but by the time [he] got to the end of the paragraph, [he] would have forgotten all [he] done read [sic] first." He said that his reading has improved since the interrogation and that he is able to understand some legal language.

Despite stating that he did not remember who else was present for the interrogation, the Defendant stated, later on in the direct examination, that he remembered Ms. Shelton telling Mr. Taylor that the Defendant could not speak to his mother. He also said that he "didn't much like [Ms. Shelton] the first time [he] met her so [he] didn't much talk to her." He stated that he recalled talking about the <u>Miranda</u> waiver when he was first arrested but that he "didn't pay no attention to it" because "[i]t didn't mean nothing to [him] at the time." He could not recall signing any statements or diagrams. He stated that he was also not taking his prescribed medication at the time of the interrogation. At the conclusion of the direct examination, several documents relating to the Defendant's educational history and mental health were introduced into evidence for the court's review.

On cross-examination, he reiterated that he did not understand what the <u>Miranda</u> waiver form meant; however, he admitted that he had been in juvenile court on previous occasions regarding other charges. He admitted that he must have signed the <u>Miranda</u> rights waiver form because he recognized his signature on the form but stated that he did not remember signing the form. He stated that he also could not remember giving most of his statement or signing his statement and that the initials throughout the statement were not his because he did not "put lines over [his] 'J's.'" He said that he did remember that he asked for an attorney and that they told him they would bring him one. He also remembered that he told the detectives that Mr. Pate offered him a motor home, an automobile, and a motorcycle to help Mr. Pate kill the victim and that he never told the detectives that he hit the victim in the head with the hatchet. He said that he told the detectives that "if that is the way they want to view a certain answer and let me out of here, I will let them believe what they want to believe." The Defendant said that he "wasn't worried about trying to put the blame on everyone else" for the victim's murder but that "[f]rom the very beginning [he] said [he] ain't killed the [victim]." When confronted with his statement, the Defendant said that he did not remember saying a lot of what was contained in the statement but stated, "I am sure some of it might have been what I said, but still all that in there isn't how I would have said it."

In denying the Defendant's motion to suppress his statement, the trial court stated,

[T]he [c]ourt lends the greatest weight to the credibility of the testimony of Detective Caldwell and [c]ourt [o]fficer Shelton. The [c]ourt quite candidly [cannot] give any weight to the [D]efendant's testimony based upon the [c]ourt's observations of him in court, the gross inconsistencies of his statements and the reasonableness of his testimony here today, his selective memory, in particular, the fact that since he [h]as been in jail, he now says he has learned to read and he has obviously picked up on a lot of the right words to say as it relates to this issue. Now, granted he is entitled to know those and he is entitled to read those himself, as he should, but this [c]ourt is satisfied that, based upon his own testimony, that he was aware of what was going on.

. . .

For all those reasons the [c]ourt finds as follows: Number one, that the [D]efendant was competent and that he gave a knowing, intelligent and voluntary waiver - - he entered into that in writing - - of his Constitutional rights. Likewise, he testified that he had been told his Constitutional rights even prior to being brought to the jail but didn't think those applied to him or didn't think it was necessary or didn't pay attention to them.

Secondly, the [c]ourt finds that the [o]fficers in this case did everything by the book. Officer Caldwell advised [the Defendant] of his rights, did it in writing and that Ms. Shelton likewise was there to further protect the [D]efendant's rights. The [c]ourt further finds there is no credible evidence in this record from which a judge could conclude that the [D]efendant asked for an attorney. In fact, the evidence is just to the contrary.

So the [c]ourt finds that the [D]efendant was properly advised of his Constitutional rights, and that from all the facts and circumstances of the interrogation and the entire facts which have been testified about in this case, that the [D]efendant knowingly, voluntarily and intentionally waive[d] his Constitutional rights to an attorney, and that he knowingly, voluntarily and intentionally gave the statement in question.

-9-

> And finally, again, the [c]ourt places the utmost credibility in the testimony of Detective Caldwell and [c]ourt [o]fficer Shelton and because of the nature of his testimony and selective memory, the [c]ourt does not give any credibility to the testimony of the [Defendant].

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial court's application of law to the facts is conducted under a de novo standard of review. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).

In Miranda v. Arizona, 384 U.S. 436, 471-75 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the Defendant made a voluntary, knowing, and intelligent waiver of his rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 46 (1938)). The waiver must be "'made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn.1994)). The State has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn.1997).

In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In cases involving juveniles, the "totality of circumstances" test requires consideration of the following factors:

(1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

(2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;

(3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

State v. Callahan, 979 S.W.2d 577, 583 (Tenn. 1998). "While courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." Id. Applying the facts of this case to the factors outlined in Callahan, the record does not preponderate against the trial court's finding that the Defendant made a knowing, voluntary, and intelligent waiver of his Miranda rights.

At the time of the interrogation, the Defendant was seventeen years old and in the ninth grade. His educational records tend to show that he was not an above average student or even an average student. The records reflect that he received a full scale IQ score of 87 and a performance IQ score of 94 on a psychoeducational evaluation conducted on April 23, 1996, approximately one year and a half before the murder and resulting interrogation. The psychological examiner noted,

> During the evaluation period, [the Defendant] gave the impression of being abrasive, surly, resistive, and intimidating. He attempted to present an "I don't care" attitude. Frequently he tuned [out] much that he heard and blurted out his responses. [The Defendant] was quite [volatile] and easily frustrated. In reaction to many questions he flippantly said, "I don't know." He much preferred working on the nonverbal than the verbal items. Often he would give up before even trying to be successful. Signs were that he is sensitive to criticism that is

both real and imagined. He sought positive reinforcement and
put forth an effort as long as a task caused him no anxiety.

While his full scale IQ score of 87 is not a particularly high score, the results are not dispositive of his intelligence on the date that he waived his Miranda rights. Also, the test results indicate that the Defendant was not actively participating in the test and that he may have received a higher score if he had cooperated with the examiner.

The Defendant seemed to indicate in his testimony that he did not understand the Miranda waiver or the consequences of waiving his rights; however, the Defendant signed the waiver and proceeded to talk with the detectives, giving them an extremely detailed account of the murder. The Defendant never told the detectives that he did not understand the Miranda waiver form or that he did not want to answer any questions. Ms. Shelton stated that she would have stopped the interrogation if she believed that he was being pressured or coerced in any way.

According to Detective Caldwell, the Defendant told him that he could read "some." Detective Caldwell testified that he read the waiver form to the Defendant. Ms. Shelton testified that she explained the process of the interrogation and the implications to the Defendant before the interrogation began. The Defendant even admitted that he was advised of his Miranda rights before the interrogation began. The Defendant had extensive experience with the juvenile court system prior to this interrogation. Indeed, when the Defendant was apprehended, he was on the run from a placement program.

According to Detective Caldwell and Ms. Shelton, the Defendant appeared alert and cognizant of his surroundings. Notably, Ms. Shelton had previously observed the Defendant in the courthouse when the Defendant was under the influence of drugs, and Ms. Shelton stated that the Defendant did not appear to be intoxicated when he was interrogated.

No testimony was presented regarding the Defendant's mental stability, and the trial court did not specifically address the Defendant's mental stability in his findings; however, the Defendant's medical records were entered into evidence at the evidentiary hearing. The medical records reflect that the Defendant was prescribed a variety of medications, and notations on some of the documents indicate that he was bipolar and that he suffered from seizures, narcolepsy, and attention deficit hyperactivity disorder. The medical records that denote the Defendant's alleged bipolar disorder relate to the Defendant's stay at St. Mary's Medical Center. The Defendant was admitted on November 10, 1995 and discharged on November 20, 1995. Another record indicates that the Defendant was schizophrenic. This record was revised on October 8, 1996; however, the record is mostly blank and does not reflect which agency was involved in this diagnosis. Two records indicate that the Defendant

was evaluated by Cherokee Health Systems on October 30, 1996 after being admitted to St. Mary's Medical Center for an emergency situation. Notations on these records indicate that the Defendant was bipolar. There was no medical testimony presented regarding the Defendant's mental condition at the time of the interrogation that occurred almost a year after dates reflected on the documents. Additionally, Detective Caldwell and Ms. Shelton both indicated that the Defendant appeared alert throughout the interrogation.

Defense counsel also argues that a notation on a caseworker's Department of Children's Services monthly report is relevant to this issue. The notation intimates that Cherokee Mental Health Center was unable to determine if the Defendant was competent to stand trial as an adult. The notation does not indicate that Cherokee believed that the Defendant was suffering from a mental disease or defect, and no mental health workers testified at the evidentiary hearing regarding the Defendant's mental state. The notation does not even explain why they were unable to determine competency. The Defendant may have simply been uncooperative in the evaluation. Moreover, competency to stand trial is relevant to the Defendant's ability to understand the proceedings at trial, not his ability to waive his Miranda rights. Blackstock, 19 S.W.3d at 208 (holding that defendant was competent to stand trial but not able to knowingly, voluntarily, and intelligently waive his Miranda rights).

Finally, the Defendant did not have a parent, guardian, or interested adult present when he was advised of his Miranda rights. However, "the admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation." State v. Carroll, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999). Also, Ms. Shelton was present to serve as an "advocate" for the Defendant, and the Defendant never asked for a parent or an attorney throughout the entirety of the interrogation.

The trial court found that the Defendant was not credible. The Defendant maintained that he could not remember much of what happened on the day that he confessed; however, he was miraculously able to remember facts and circumstances that were potentially helpful to his case. The testimony from Detective Caldwell and Ms. Shelton support the trial court's conclusion that the Defendant made a knowing, voluntary, and intelligent waiver of his Miranda rights before he confessed. While the Defendant's alleged bipolar condition is troubling, the testimony of Detective Caldwell and Ms. Shelton decried any notion that the Defendant was experiencing any emotional or psychological issues during the interrogation. Further, there was no evidence of coercive police activity. Accordingly, we conclude that the record does not preponderate against the trial court's finding that the Defendant knowingly, voluntarily, and intelligently waived his Miranda rights.

II.  Inadmissible Photographs

The Defendant contends that the trial court erred in declining to declare a mistrial when inadmissible photographs were published to the jury through a projector screen.  The State responds that this issue is waived because the Defendant failed to make a contemporaneous request for a mistrial and that there was no manifest necessity for a mistrial to establish plain error review.

The State attempted to introduce a photograph of Mr. Kessler's house at trial.  As the photograph was shown on a projector screen, defense counsel asked to approach, and the following exchange took place at the bench:

DEFENSE:  Your honor, obviously the jury is now seeing those gruesome photos that were ruled inadmissible, especially the one from yesterday.

COURT:  I'll be real candid with you, as soon as that came up - -

STATE:  Was that up there?

COURT:  Oh, yes.

DEFENSE:  Yes, it was on.

COURT:  Yes, there's no question it was on there.  I don't think from a distance - - I'll be honest with you, if I thought it was, we'd start over, but I don't think from a distance that unless they knew on the front end what that was then I don't think that they could recognize it.  Now, that's my best sense of it.  But, General, we've got to be awful careful.

STATE:  I think what I'll do is just pass them to the jury.

COURT:  I think that would be the safest, at least unless it could be done where that wouldn't be shown.

STATE:  Yes.

DEFENSE: And, [y]our [h]onor, for the record for clarification for the transcript, what I was asking to approach on was the objection that what was being referenced on the PowerPoint presentation was the photographs that we had seen previously, and were shown on the projection.

COURT: Say that one more time.

DEFENSE: For the record, since we all know what we're talking about, what was being shown on the projector screen was the photographs of the deceased's body that was previously ruled inadmissible.

STATE: Do you want to have a jury-out on that and show that, because they shouldn't be on there. I'm sorry.

COURT: Well, it's - -

STATE: I'm saying it's not on there. I didn't see it.

COURT: It was there.

DEFENSE: It was.

COURT: Tell him to pull them down now.

DEFENSE: Now.


At this point, the trial court asked the jury to leave the courtroom before stating,


COURT: Let the record reflect that counsel has made the objection that the photographs, one of the photographs at least, that had been excluded by the [c]ourt was shown on that screen. Certainly the [c]ourt agrees with that. The [c]ourt has said

-15-

and the [c]ourt notes that it was a smaller version, it was an index, but still it was on there. The [c]ourt does not think, again, absent being pointed to directly, that anyone could identify what it was at that point. The [c]ourt also notes that if the slides are going to continue to be shown, the monitor right here needs to be turned away from the jury because the jury members can see that monitor from the box.

Counsel, let's be very, very careful with this because the [c]ourt has ruled. I know everybody wasn't here, some of the participants were not here on the day of our hearing on Monday, but we need to be very, very careful with that because we don't want to have to try this again.

Now, how do you propose to proceed, General, on the photographs in question.

The State and the trial court agreed that the best way to proceed was to introduce the photographs in their hard copy version and forego the use of the projector screen. In relation to defense counsel's objection, the trial court stated,

COURT: Ms. Sheldon, do you want me to give any instruction? I mean, you know, it's up to you. I mean, I know you made your objection and you're not waiving any of that - -

DEFENSE: Right.

COURT: - - but as far as going forward with this jury?

DEFENSE: No, at this point, I would not. At this point and just for the record, I think a curative instruction at this point - -

COURT: Might make it worse.

DEFENSE: - - might be more prejudicial.

-16-

COURT:    I think you're right.

We first note that defense counsel did not request a mistrial and rejected the offer of a special instruction; therefore, the issue is waived. Tenn. R. App. P. 36(a). However, the Defendant appears to assert that the trial court should have sua sponte declared a mistrial. The decision of whether to grant a mistrial is "within the sound discretion of the trial court," State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996), and the trial court's ruling will not be disturbed absent a finding of an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). The grant of a mistrial "is usually appropriate in a criminal case only where there is a 'manifest necessity'" for such action by the trial court. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). On appeal, the defendant bears the burden of establishing that a "manifest necessity" for granting a mistrial existed. Id.

We acknowledge that the photographs at issue were previously ruled inadmissible at a motion hearing. The photographs appeared as an index image on a projector screen when the State was attempting to project the photograph of Mr. Kessler's house. The photographs were not referenced in front of the jury, and there is no testimony in the record that the jury even noticed the photographs. Moreover, without elaboration and direction by the State, we agree with the trial court that the jury probably would not have been able to tell that the photographs were pictures of the victim's mutilated body. Notably, defense counsel even declined the use of a curative instruction because she believed that an instruction would draw more attention to the photographs and that the attention would be even more prejudicial than the brief opportunity to view the inadmissible photographs. Following our review, we conclude that a manifest necessity did not exist for declaring a mistrial. Accordingly, we also conclude that the trial court did not err in not declaring a mistrial.

### III. The Skull as an Exhibit

The Defendant contends that the trial court erred in allowing the forensic pathologist to use the victim's cleansed and reconstructed skull when testifying about the victim's injuries. The Defendant also contends that the pathologist's "thorough and clear testimony" rendered the skull's use unnecessary and that the photographs of the skull would have sufficiently portrayed the victim's injuries. The State responds that the Defendant has failed to show that the trial court abused its discretion in deeming the skull admissible as an exhibit at trial when there was no better evidence to establish the extent of the victim's injuries. The State also responds that the skull, which had been thoroughly cleansed, was no more prejudicial than a model diagram.

-17-

At trial, Dr. Marks testified at length regarding the victim's injuries. Dr. Mark's stepped down off the witness stand and faced the jury for the majority of his testimony regarding the skull. He said that after sifting the sewage from the cistern through the window screens, they realized "that parts [of the skull] were coming out in pieces, some large pieces and then some really small tiny pieces." After retrieving all of the pieces, he was able to "fit [the skull] back together." He said that the victim's skull is not "a normal configuration of a skull" because the skull was "fractured extensively." He said that the "skull grows together by virtue of pieces but once [the skull is] mature it's a pretty solid piece of bone except for the jaw." He said that the "bottom part of the jaw" always "remains separate."

Dr. Marks stated that the research conducted by himself and his team demonstrated that "there w[ere] at least five impacts that the skull received by looking at the fracture lines of the skull." There were two impacts on the side of the head, one on the top of the head, one on the front of the head, and one on the front of the face by the top teeth. Dr. Marks then pointed out the points of impacts located on the skull. He was unable to determine which blow or impact was inflicted first because "there [were] so many impact sites there that that was pretty hard to do." He said that he was able to find the five impact sites because the areas on the skull "that are depressed and . . . the other areas that have circular regions . . . demonstrate impact sites." In regard to the impact on the front of the skull, he stated, "[T]he impact on the front was just to the left of the two front teeth and the fracture of the jaw in this region, in the upper jaw."

Dr. Marks then showed the jury which parts of the skull he received from Dr. Cleland Blake, who performed the autopsy on the victim. He said that he received the lower part or base of the skull from Dr. Blake, a forensic pathologist in Morristown, and that everything above a certain point on the face and the mandible or jaw bone was recovered by Dr. Marks and his team. He also recovered the lower mandible from the cistern. The lower mandible showed "sharp force trauma to the bottom part of the jaw." The injury to the lower mandible could have been caused by "something heavy, a hammer, a tire iron, [or] a pipe." The lower mandible also showed some "sharp force" trauma, which could have been caused by the use of a blade or knife of some kind.

Upon returning to his seat, Dr. Marks then examined the hatchet that was previously introduced into evidence. He stated that the hatchet was "heavy enough to cause [the] type of damage" to the skull that the victim received. Dr. Marks also said the larger knife found at the scene could have caused the trauma on the lower mandible. The smaller knife found at the scene could have also caused the trauma on the lower mandible "with some force." Dr. Marks then identified various photographs of the skull and pointed out the various impact sites on the skull once again.

-18-

On cross-examination, Dr. Marks testified that the concrete at the bottom of the cistern "was not laying on top of any bone." However, the concrete could have hit the pieces of the bone and "popped them aside." He stated that the body decomposed at a slower pace because it was in water. He reiterated that all he found at the scene was bone and that he did not "recover any soft tissue." He agreed that his analysis of the skull did not show that the victim was decapitated or that the head was severed but that the pieces of the skull probably became loose and fell to the bottom of the cistern as the body decomposed. He stated that he was not provided the weapons for analysis purposes prior to his testimony; however, even if he were provided with the tools prior to trial, he could not have determined which tool caused which injury because that is not his speciality. While he could not determine which injury caused the victim's death, Dr. Marks stated that he had "been at enough autopsies to see skulls with much less trauma where the pathologist has said, well, the cause of death was brain tissue disruption based on bone going in."

In declining to exclude the skull as evidence, following a discussion of the applicable case law and other cases the trial judge presided over, the trial court stated, "I honestly think that the State is entitled to show the skull." The trial court also instructed the State to refrain from passing the skull to the jury.

When issues of evidence relevancy are presented, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). The trial court's exercise of its discretion may not be reversed on appeal unless the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

As a general rule, "[a]ll relevant evidence is admissible," while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The introduction of the skull in this case was relevant to show the nature of the injuries to the victim's skull. State v. Morris, 641 S.W.2d 883, 888 (Tenn. 1982). The skull was also relevant to show the type of weapon used to inflict the injuries to the victim's skull. See State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994) (holding that the victim's skull was

relevant in illustrating the forensic pathologist's testimony that he found a "signature" for the murder weapon). The skull was a relevant tool used by Dr. Marks to illustrate the process of reconstructing the skull from the various pieces found in the cistern. Id. The skull also corroborated the Defendant's statement to police regarding the type of weapon used to kill the victim. State v. Donald Lynn Miller, No. E1999-00148-CCA-R3-CD, 2001 WL 72250, at *3 (Tenn. Crim. App. 2001), perm. app. denied (Tenn. May 1, 2006).

We note that the skull was not passed to the jury. See State v. Richard Burt McKee, No. 03C01-9603-CR-00092, 1998 WL 202475, at *5 (Tenn. Crim. App. 1998), perm. app. denied (Tenn. Nov. 9, 1998). Moreover, "[t]he skull had been cleansed and was no more prejudicial or gruesome than a model or diagram would have been." Morris, 641 S.W.2d at 888. We do acknowledge the Defendant's argument that the skull was not necessary because the photographs were also used to demonstrate the number and location of the impact sites on the victim's skull. As discussed above, we believe that the skull was used in other ways. We also believe that the photographs would not have been as useful in portraying all of Dr. Marks's testimony. Accordingly, we conclude that the trial court did not err in allowing the skull to be used as an exhibit at trial.

## IV. Sufficiency

The Defendant contends that the trial court erred in finding that the verdict was appropriate where the proof submitted was lacking as to premeditation. In essence, the Defendant argues that the evidence regarding premeditation was not sufficient to uphold his conviction. The State responds that the evidence regarding premeditation was sufficient for any jury to conclude that the Defendant committed first degree premeditated murder.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not re-weigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and

circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. 39-13-202(d) (internal quotations omitted). The element of premeditation only requires the Defendant to think "about a proposed killing before engaging in the homicidal conduct." <u>State v. Brown</u>, 836 S.W.2d 530, 541 (Tenn. 1992). Factors from which a jury may infer premeditation include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of the intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." <u>Bland</u>, 958 S.W.2d at 660.

Considering the evidence in the light most favorable to the State and drawing all reasonable inferences therefrom, the State's proof showed that after repeated offers of compensation for his help, the Defendant finally relented and told Mr. Pate that he would help kill the victim. The Defendant then went outside and watched as Mr. Pate cut the victim's throat with a knife. When instructed to get a hatchet from the storage building, the Defendant complied and returned with the hatchet. After Mr. Pate hit the victim with the hatchet, the Defendant hit the victim with the hatchet. It is unclear how many times the Defendant hit the victim. After the victim was rendered helpless, the two went inside to plan the concealment of the body.

Taking into consideration the <u>Bland</u> factors regarding premeditation, the victim was unarmed and hit several times with a deadly weapon. Although we cannot be sure how many times the Defendant hit the victim, the victim admits hitting the victim at least once. This was an especially cruel killing in that the victim was unarmed and was repeatedly stabbed with a knife and hit with a hatchet before finally dying from the assault. The victim's attempt to plead for her life was not successful as she was then hit several times with a hatchet. Indeed, Dr. Marks testified that the victim received approximately five blows to the head and that her skull was broken into several pieces from the impact of the murder weapon.

The Defendant declared that he would help Mr. Pate kill the victim. In response to the Defendant's declaration, Ms. Breeden handed the trailer title to Ms. Peters. The Defendant procured a weapon for Mr. Pate and then used the weapon on the victim. There was not sufficient proof that the two pre-planned the concealment of the body; however, the two did plan the concealment of the victim's body after the crime. There was also not

sufficient proof that the two were calm after killing the victim. Indeed, the Defendant's statement reflects that he and Mr. Pate drank vodka to "settle [their] nerves." While we recognize that all of the factors were not proven, this list is merely a suggestion regarding which factors a jury may consider in finding premeditation. Accordingly, we conclude that there was sufficient proof of premeditation to support a first degree murder conviction.

## V. Sentencing

The Defendant was seventeen at the time of the offense and was transferred from juvenile court; therefore, the State was unable to seek the death penalty. Following the jury's verdict of guilty for murder in the first degree, the Defendant waived jury determination of his sentence in accordance with Tennessee Code Annotated section 39-13-205(b). A separate sentencing hearing was held in which Ms. Stephanie Phillips and Ms. Dorothy Waterhouse Cratzer testified on the State's behalf.

Ms. Phillips, the victim's sister, testified that the victim's death was very hard on her and her mother. She stated that the victim's death has caused her to be afraid for her children's safety and that her children lost an aunt that "they loved very much." She stated that the victim "was a very loving, caring person" and that the victim "loved animals and all her family [and friends]." She said that the victim was "planning on going back to school" before she was murdered. She said that it is hard for her to trust new people because of what happened to her sister.

Ms. Cratzer, the victim's grandmother, testified that the victim's father "has had two strokes" and "will never work again" because of his daughter's murder. She said that she still does not understand why all of this happened to her granddaughter.

The State presented the following two aggravating factors for the trial court's consideration:

> (4) The [D]efendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration; [and]

> (5) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death

Tenn. Code Ann. § 39-13-204(i)(4), (5) (1997). In response, the Defendant submitted the following four statutory mitigating circumstances:

-22-

(5) The [D]efendant was an accomplice in the murder committed by another person and the [D]efendant's participation was relatively minor;

(6) The [D]efendant acted under extreme duress or under the substantial domination of another person;

(7) The youth or advanced age of the [D]efendant at the time of the crime; [and]

(8) The capacity of the [D]efendant to appreciate the wrongfulness of the [D]efendant's conduct or to conform the [D]efendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected the [D]efendant's judgment

Tenn. Code Ann. 39-13-204(j)(5) - (8) (1997). Following a brief statement by the Defendant and closing arguments by the State and defense counsel, the trial court sentenced the Defendant to life imprisonment without the possibility of parole. The trial court stated,

This [c]ourt must find, must find, based upon the repeated blows, the young lady begging for her life, and at least this [D]efendant struck one blow according to his own testimony, but these folks, including this [D]efendant and others, agreed before they went outside that they were going to kill this young woman and there they carried out their design and then dumped her in a cistern. This [c]ourt must find beyond a reasonable doubt, beyond any doubt, that this is a most atrocious and heinous crime, and that that is one aggravating factor pursuant to the law that the [c]ourt finds.

Secondly, the [c]ourt must find that the uncontradicted testimony and by beyond a reasonable doubt, in fact any doubt, that this [D]efendant committed this offense with the anticipation of remuneration of pay that he was going to be given various pieces of personal property for his participation in the activities. So the [c]ourt does find those two enhancing

factors to be present beyond a reasonable doubt, and in fact any
doubt.

. . .

This [c]ourt is well satisfied, well satisfied, that except for his
youth that none of the offered mitigating factors are applicable.
This [c]ourt could go on and on, and that will not change the
fact of what's happened and what we have done here this week
in this trial.

So, for the reasons stated, the [c]ourt has considered and does
find obviously that he was 17 years old, and that's a factor that
the [c]ourt has considered as a mitigating factor and I accept it
as that. But likewise, the [c]ourt has found the two aggravating
circumstances that I have previously stated and either one of
those, either one of those two enhancing factors found by the
[c]ourt would outweigh any mitigation in this case. This was a
horrendous crime, and except for one or two others in my time
on the bench at least, this ranks right at the top. Murder is
murder, yes, and there's no question about it, and all murders are
bad, but our law requires us to apply these factors in imposing
the more serious sentences for these offenses, and the [c]ourt
feels that the facts and circumstances of this case deserve it.

The Defendant contends that the trial court erred in sentencing the Defendant to life
imprisonment without the possibility of parole. The Defendant also contends that the trial
court erred in declining to apply mitigating factor number 8 because the trial court considered
the factor as if the Defendant were arguing a defense of diminished capacity and that the
Defendant's remorseful and heartfelt statement should have been considered as mitigation
under the catch-all factor. The State responds that the evidence was sufficient to support the
trial court's sentencing decision.

In declining to apply mitigation factor number 8, the trial court stated,

And then it's alleged that his capacity to appreciate the
wrongfulness of his conduct or to conform conduct to the
requirements of law was substantially impaired as a result of
mental disease or defect which was insufficient to establish a
defense to the crime but which substantially affected his

-24-

judgment, likewise the [c]ourt does not find that because this [D]efendant, again, was approached apparently, according to his statement, several times to involve himself in this plan to kill this victim and another man and he said he did not want to do it and then later changed his mind. This [c]ourt is satisfied beyond any doubt that this [D]efendant knew exactly what he was doing, that [the Defendant] could appreciate the wrongfulness of his conduct. So the [c]ourt does not find that mitigation factor applicable.

"After a verdict of first degree murder is found, the defendant . . . may waive the right to have a jury determine punishment, in which case the trial judge shall determine punishment . . . ." Tenn. Code Ann. § 39-13-205(b); see also State v. Carpenter, 69 S.W.3d 568, 574 (Tenn. Crim. App. 2001). When the death penalty is not sought by the State, "the [trial court] shall fix the punishment in a separate sentencing proceeding, to determine whether the defendant shall be sentenced to imprisonment for life without possibility of parole or imprisonment for life." Tenn. Code Ann. § 39-13-207(a). This "sentencing proceeding shall be conducted in accordance with the provisions of [Tennessee Code Annotated] § 39-13-204, excluding references to the death penalty." Tenn. Code Ann. § 39-13-207(a). The trial court may not consider a sentence of life imprisonment without parole unless the State has proven at least one statutory aggravating factor beyond a reasonable doubt. Tenn. Code Ann. § 39-13-207(c). The aggravating factors that may be presented by the State are contained in Tennessee Code Annotated section 39-13-204(i). If the trial court concludes that the State has not proven at least one statutory aggravating factor, the defendant must be sentenced to imprisonment for life. Tenn. Code Ann. § 39-13-207(b).

After determining that the State has proven at least one statutory aggravating factor, the trial court "shall weigh and consider the statutory aggravating circumstance or circumstances proven by the [S]tate beyond a reasonable doubt and any mitigating circumstance or circumstances." Tenn. Code Ann. § 39-13-207(d). However, the trial court "need not find that the statutory aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt" to impose a sentence of life imprisonment without parole. State v. James Lee Cannon, No. 03C01-9808-CR-00272, 1999 WL 778046, at *5 (Tenn. Crim. App. 1999); see also State v. Kelvin Anthony Lee, No. 02C01-9603-CC-00085, 1997 WL 686258, at *10 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. Aug. 3, 1998). This court must uphold a sentence of life imprisonment without parole "if the [S]tate proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in [Tennessee Code Annotated section] 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the [trial court or] jury's discretion." Tenn. Code Ann. § 39-13-207(g).

The Defendant's contention that the trial court applied the wrong standard when considering mitigating factor number 8 is misplaced. The trial court quoted the language of Tennessee Code Annotated section 39-13-204(j)(8) verbatim before concluding that the factor did not apply because the Defendant was able to appreciate the wrongfulness of his conduct. Additionally, the trial court considered the catch-all provision before finding that only one mitigating factor, the Defendant's age at the time of the crime, applied in the Defendant's case. The record supports the trial court's finding of the two aggravating factors proven by the State. While the trial court's finding that the aggravating factors outweighed the mitigating factor was not a necessary finding, the trial court's sentencing decision was not imposed arbitrarily. Accordingly, we conclude that the trial court did not err in imposing a sentence of life imprisonment without parole.

## VI. Motion for New Trial

The Defendant contends that the trial court erred in not granting the Defendant a new trial. The Defendant incorporated the prior arguments submitted in the brief, which have been discussed in this opinion, in support of his contention. The State does not respond to this argument. Following our review, we conclude that none of the Defendant's previous allegations warranted relief; therefore, there is no merit to this issue. Accordingly, we also conclude that the trial court did not err in denying the Defendant's motion for a new trial.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE